MICHAEL N. FEUER (SBN 111529)
CITY ATTORNEY
*mike.feuer@lacity.org*
JAMES P. CLARK (SBN 64780)
CHIEF DEPUTY CITY ATTORNEY
*james.p.clark@lacity.org*
CITY OF LOS ANGELES
200 N. Main Street, Room 800
Los Angeles, CA  90012
Telephone:  (213) 978-8100

STEVE W. BERMAN (*pro hac vice* pending)
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292

ELAINE T. BYSZEWSKI (SBN 222304)
*elaine@hbsslaw.com*
LEE M. GORDON (SBN 174168)
*lee@hbsslaw.com*
CHRISTOPHER R. PITOUN (SBN 290935)
*christopherp@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiff*
*THE PEOPLE OF THE STATE OF CALIFORNIA*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>                                    Plaintiff,<br><br>        v.<br><br>CITIGROUP INC.; CITIBANK, N.A.; CITIMORTGAGE, INC;  CITICORP TRUST BANK, FSB; and  CITI HOLDINGS, INC.,<br><br>                                    Defendants. | No. 2:14-cv-09749<br><br>**COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW**<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPEITION LAW
010346-12 733870 V2

**TABLE OF CONTENTS**

Page

I.     NATURE OF THE ACTION ...................................................................... 1

       A.     Citigroup Inc. Has Engaged in a Continuing Pattern of
              Discriminatory Mortgage Lending Practices in Los Angeles ............... 1

II.    PARTIES ......................................................................................................... 5

III.   JURISDICTION AND VENUE ................................................................... 7

IV.    FACTUAL BACKGROUND ........................................................................ 7

V.     CITI ENGAGED IN DISCRIMINATORY LENDING
       PRACTICES ................................................................................................. 11

       A.     Citi's Conduct Had a Disparate Impact on Minority Borrowers in
              Violation of the Fair Housing Act ....................................................... 11

              1.     Minority neighborhoods are disproportionate recipients of
                    predatory loans ............................................................................. 11

       B.     Citi Intentionally Discriminated Against Minority Borrowers in
              Violation of the Fair Housing Act, as Demonstrated by Former
              Bank Employees ...................................................................................... 16

              1.     Citi targets minorities for predatory loan terms. ..................... 18

              2.     Citi gives its employees discretion to steer people who
                    qualify for prime mortgages into discriminatory mortgages
                    (and pays its employees more for doing so). ............................. 20

              3.     Citi limits the ability of minority customers to refinance out
                    of the same predatory loans that they previously received
                    from the Bank. .............................................................................. 20

              4.     Citi engages in other abusive lending practices. ..................... 23

       C.     Minorities in Fact Receive Predatory Loan Terms from Citi ............ 24

       D.     Minorities in Los Angeles Receive Such Predatory Loan Terms
              from Citi Regardless of Creditworthiness ........................................... 26

VI.    STATUTE OF LIMITATIONS AND CONTINUING
       VIOLATIONS DOCTRINE ....................................................................... 28

VII.   CLAIM FOR RELIEF ................................................................................ 29

CLAIM FOR RELIEF  (Violation of the Unlawful Prong of the Unfair
       Competition Law based on violation of the Federal Fair Housing
       Act, 42 U.S.C. §§ 3601, et seq.) ............................................................. 29

- i -

1

DEMAND FOR JURY TRIAL .................................................................... 31

PRAYER FOR RELIEF ........................................................................... 31

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-12  733870 V2

The People of the State of California ("People" or "Plaintiff"), by and through the City Attorney for the City of Los Angeles, allege as follows:

## I.    NATURE OF THE ACTION

1.    It is axiomatic that banks should not make discriminatory loans. Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers. Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics. When banks engage in such conduct, they violate minorities' statutory rights against discrimination. And Plaintiff has a substantial interest in protecting the well-being of its populace –particularly in securing its residents from discrimination.

**A.    Citigroup Inc. Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles**

2.    This suit is brought pursuant to the unlawful prong of California's Unfair Compeition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*., based on statutory violations of the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by People to seek redress Citigroup Inc.'s[1] ("Citi" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending. The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

3.    Citi has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis. In order to maximize profits at the expense of minority borrowers, Citi adapted its unlawful discrimination

---

[1] Defendants collectively are referred to as "Citi," including: CitiGroup Inc., CitiBank, N.A., CitiMortgage, Inc., CitiCorp Trust Bank, FSB. Citi Holdings, Inc. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, ABN Amro Mortgage Group, Inc., Ameriquest Mortgage Company, Argent Mortgage Company, Argent Mortgage Company LLC, and Olympus Mortgage Company.

- 1-

to changing market conditions.  This unlawful pattern and practice is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the UCL has not commenced to run.

4.      The pattern and practice of lending discrimination engaged in by Citi consists of traditional redlining[2] and reverse redlining,[3] both of which have been deemed to violate the FHA by federal courts throughout the country.  Citi engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Los Angeles on equal terms as offered to non-minority borrowers.  Citi engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Los Angeles on the basis of the race or ethnicity of its residents.  Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination, and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[4]

5.      Major banks such as Citi have a long history of engaging in redlining throughout Los Angeles.  That practice began to change in the late 1990s, when Citi adapted to changing market conditions, and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms, when compared to the mortgage loans issued to white borrowers (reverse redlining).

---

[2] Redlining is the practice of denying credit to particular neighborhoods based on race.

[3] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[4] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) *available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

- 2 -

6.      Citi's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford.  Reverse redlining maximizes Citi's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, Citi has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "Citi Loans").

7.      Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from Citi's previous pattern and practice of redlining in the minority communities in Los Angeles created conditions whereby the Bank could easily target and exploit underserved minority communities which, due to traditional redlining, had been denied credit.

8.      Thereafter, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Los Angeles, commencing in or around 2007, Citi once again adapted to changing market conditions, while continuing its pattern and practice of issuing a variety of discriminatory loan products.  Simultaneously, Citi also decided to curtail the issuance of mortgage credit to minority borrowers in Los Angeles.[5]  In other words, Citi not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms.  This combination of reverse redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Los Angeles that still exists today.

---

[5] California Reinvestment Coalition, *From Foreclosure to Re-Redlining* (2010), at 4 (available at
http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

- 3-

9.     The Bank's discriminatory lending practices, including targeting of minorities and the discretion and incentive arrangements that result in the disproportionate issuance of discriminatory loans to minorities, are evidenced by information from confidential witness statements provided by former employees of Citi (discussed further herein).  For example:

(a)     "I definitely saw people with good credit scores in subprime."

(b)     "They (management) teach you to be very persuasive and not take no for an answer. . . You try to convince them to use the equity in their home."

(c)     "They would kick back a lot of the minorities and old people" as unqualified for loan modifications.  "I couldn't talk on the phone with them anymore.  I'd just say, 'Oh my God, I wish I could help you.' They were in financial hardship.  It was just awful. Awful."

(d)     Citi "wasn't really thinking about preserving the property or keeping the people in the property.  It was just foreclose, foreclose, foreclose."

10.     The reports of these witnesses are confirmed when Los Angeles data on Citi loans is examined.  Such an examination reveals a widespread practice of discrimination.  For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American Citi borrower is 2.273 times more likely to receive a predatory loan than was a white borrower, and a Latino borrower was 2.389 times more likely to receive such a loan.  The regression analysis confirms that African-Americans with FICO scores over 660 are 3.050 times more likely to receive a predatory Citi loan as is a white borrower, and a Latino borrower is 2.614 times more likely to receive such a loan.

11.     A variety of governmental and private actions have been asserted against Citi relating to predatory lending practices.  In 2000, Citi acquired Associates

- 4 -

First Capital Corporation, which was widely criticized for predatory lending practices. Citi eventually settled with the Federal Trade Commission by agreeing to pay $240 million to customers who had been victims of predatory practices. In 2007, Citi indicated that its exposure to subprime mortgages was less than $13 billion, when in fact it was over $50 billion; the Securities and Exchange Commission said that Citi had made misleading statements about the company's exposure. In 2010, Citi agreed to pay $75 million to settle civil charges that it misled investors over potential losses from high-risk mortgages. In 2012, Citi agreed to pay $158 million to settle claims that it falsely certified the quality of loans issued by its CitiMortgage unit over a period of more than six years, so that they would qualify for insurance from the Federal Housing Administration.

12.     During the financial crisis of 2008, Citi suffered huge losses and was rescued in a massive stimulus package by the U.S. government. In 2009, Citi announced that the United States government would take a large equity stake in the company by converting emergency aid into common shares with a U.S. Treasury credit line to prevent bankruptcy. In 2010, Citi repaid the government aid and repurchased its shares from the U.S. government. In fact, Citi amassed a huge cash flow in the wake of the financial crisis.

13.     In this action the People seek injunctive relief to halt the discriminatory lending described herein and penalties based on each discriminatory loan issued and/or each mortgage payment made pursuant to a discriminatorily issued loan by Defendants.

## II.     PARTIES

14.     Michael Feuer, City Attorney for the City of Los Angeles, acting to protect the public as borrowers from unlawful business practices, brings this action in the public interest in the name of the People of the State of California pursuant to section 17200 of the California Business and Professions Code. Plaintiff, by this

- 5-

action, seeks to enjoin Defendants from engaging in the unlawful business practices alleged herein, and seeks civil penalties for the Defendants' violations of the above statute.

15.     Citigroup Inc. is a multinational financial services corporation and bank holding company.  Upon information and belief, its corporate headquarters are located in New York, New York.  Citigroup was formed from one of the world's largest mergers in history by combining the banking giant Citicorp, and financial conglomerate Travelers Group, in October 1998.  It is currently one of the largest banks in the United States.  Citigroup's major brand names include Citibank, CitiFinancial, Primerica, Citi Smith Barney, Banamex, and Nikko.  Citigroup owns and controls Citibank, N.A.

16.     Upon information and belief, Citibank's corporate headquarters are located in Sioux Falls, South Dakota.  Citibank is organized as a national banking association under the laws of the United States.  Citibank owns CitiMortgage, Inc.

17.     Upon information and belief, CitiMortgage is based in O'Fallon, Missouri.  CitiMortgage is an operating subsidiary of Citibank.  CitiMortgage maintains offices in the State of California for the purposes of soliciting applications for and making residential mortgage loans, and engaging in other business activities, including specifically with the City of Los Angeles.

18.     The CitiFinancial Mortgage division of Citi offered exclusively non-prime loans.  These loans were offered to both consumer direct and wholesale clients.

19.     In 2009, Citi announced that it would realign into two businesses, Citicorp and Citi Holdings.  The latter, Citi Holdings, included CitiMortgage. Regarding Citi's strategy for these businesses going forward, Citi explained "management will focus on tightly managing risks and losses, and maximizing the

- 6-

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

1   value of these assets."  And, "with the new Citi Holdings, we will be able to tighten

2   our focus on risk management…."[6]

3       20.   Based on information reported pursuant to the Home Mortgage

4   Disclosure Act, in addition to loans that Defendants originated directly, Defendants

5   are responsible for residential home loans acquired from, and/or sold by or through,

6   ABN Amro Mortgage Group, Inc., Argent Mortgage Co., Ameriquest Mortgage Co.,

7   and Town & Country Credit Corp.

8       21.   Upon information and belief, Plaintiff alleges that each of the

9   Defendants was and is an agent of the other Defendants.  Each Defendant, in acting

10  or omitting to act as alleged in this Complaint, was acting in the course and scope of

11  its actual or apparent authority pursuant to such agencies, and/or the alleged acts or

12  omissions of each Defendant as agent were subsequently ratified and adopted by

13  each agent as principal.  Each Defendant, in acting or omitting to act as alleged in

14  this Complaint, was acting through its agents, and is liable on the basis of the acts

15  and omissions of its agents.

## III.   JURISDICTION AND VENUE

16

17      22.   This Court has jurisdiction over this matter pursuant to 42 U.S.C.

18  § 3613, and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under

19  the laws of the United States.  Plaintiff's unlawful prong claim under the UCL

20  necessarily requires determination whether Defendants violated the FHA.

21      23.   Venue is proper in this district under 28 U.S.C. § 1391(b), because Citi

22  conducts business in this District, and a substantial part of the events and omissions

23  giving rise to the claims occurred in this District.

## IV.   FACTUAL BACKGROUND

24

25      24.   Prior to the emergence of subprime lending, most mortgage lenders

26  made only "prime" loans.  Prime lending offered uniformly priced loans to

27  ───────────────

28  [6] Press Release, Citigroup Inc., Citi to Reorganize into Two Operating Units to
    Maximize Value of Core Franchise (Jan. 17, 2009) (on file with author).

- 7 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

25.     Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders.  Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit would successfully repay a loan.  These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

26.     Responsible subprime lending has opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending.

27.     Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  Once made, a significant number of the loans were sold on the secondary market.

28.     As the subprime market grew, the opportunities for abusive practices grew with it.  As a consequence, the federal government has found that abusive and

predatory practices "are concentrated in the subprime mortgage market."[7]  These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

a.      Placing borrowers in subprime loans even though they qualify for prime or conventional loans on better terms.

b.      Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[8]  After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on considerations of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term. Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

c.      Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much, or even all, of that equity through substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that

---

[7] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000), at 1 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[8] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

aggressively market the notion that borrowers can pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead them into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly, with ever-increasing fees and higher interest rates, and with ever-decreasing equity.

        d.      Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

        e.      Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, reserves, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, ignoring these criteria often results in loans that bear no relation to borrowers' ability to repay them – but allows the lender to make a quick profit from the origination.

        f.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan.  Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to refinance needlessly one subprime loan with another.

        g.      Charging excessive points and fees that are not associated with any increased benefits for the borrower.

29.    The problem of predatory practices in subprime mortgage lending is particularly acute in minority communities because of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  This is in contrast to "redlining," which is

the practice of denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area.  Both practices have repeatedly been held to violate the Federal Fair Housing Act.

30.     Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans).  At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

## V.     CITI ENGAGED IN DISCRIMINATORY LENDING PRACTICES

### A.     Citi's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act

#### 1.     Minority neighborhoods are disproportionate recipients of predatory loans.

31.     There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market.  These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[9]

---

[9] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/mortgage-lending/research-analysis/*Lost-Ground-- 2011*.pdf ); Center for Responsible Lending, *Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011- Unfair_Lending-0506.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid- carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf).

- 11-

32.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice as likely) to obtain higher-priced loans than were white borrowers. These relationships hold both for home-purchase and refinance lending, and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending and in application denial rates across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[10]

33.     African-Americans and Hispanics were much more likely to receive subprime loans and loans with predatory features, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[11]

34.     In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties. Disparities in the incidence of these features are evident across all segments of the credit spectrum.

---

[10] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf).

[11] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

- 12-

35.    A 2010 Report from the California Reinvestment Coalition finds: "[The] hardest-hit communities are racially concentrated, low to moderate income areas of African-Americans and Latinos that were saturated with high-cost, subprime lending since 2000.  Neighborhoods once redlined – where lenders refused to lend in neighborhoods of color without regard to the actual financial qualifications of residents – were flooded in the past decade with high-cost subprime loans and abusive option ARM loans.  These loans were often unaffordable and unsustainable for working class families, and inevitably led to large scale foreclosures.  In the past two years, borrowers and communities struggling to preserve their primary asset – their home – have found that banks are not willing to work with them to restructure their mortgages or to offer new loans."[12]  Key findings from the 2010 Report include:

(a)    California cities are more likely than the national average to be saturated with low documentation loans (*e.g.*, stated income loans).  In Los Angeles, 74% of all loans in the sample were made with limited documentation, as compared to only 56% for all loans in the sample.

(b)    Minority neighborhoods saw a dramatic decrease in lower cost prime loans in 2008.  The drop off from 2006 to 2008 was stunning.  In Los Angeles, less than 1/3rd as many prime loans were made available by big bank lenders in minority neighborhoods in 2008, as compared to 2006.

(c)    In 2008, nearly one out of two African-Americans and Latinos seeking a home loan or refinance were denied, as compared to only about one in four whites.

(d)    Even though high-cost lending began to decrease significantly by 2008, when it occurred, it was still more likely to occur in minority neighborhoods as compared to white neighborhoods.  The big bank lenders still were more than twice as likely to sell subprime loans in minority neighborhoods in Los Angeles, as compared to white neighborhoods.

---

[12] California Reinvestment Coalition, *From Foreclosure to Re-Redlining,* at 1 (2010) (available at http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

(e)     In many cases, minority borrowers were overburdened not only by subprime lending but by other onerous loan terms, such as prepayment penalties, yield spread premiums, option ARMs, and HELOCs.

(f)     In the wake of the subprime meltdown, as underwriting tightened for all loans, higher cost FHA mortgage loans were the "only game in town" left for many new homebuyers.

36.     Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank.  For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit ("HELOCs") and higher cost FHA/VA loans.[13]  FHA and VA government loans are characterized as higher risk loans because they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional loans.[14]  Additionally, this fact is further corroborated by the FHA/VA Mortgage Programs webpage for one of the defendant banks in the People's related lending cases.  According to Wells Fargo's website: (a) "In many instances, you may find FHA to be a more expensive financing option and should be considered after thoroughly evaluating all other product options that meet your credit qualifying and financial needs;" (b) "You typically have to pay upfront and monthly FHA mortgage insurance premiums;" and (c) "You typically have to pay a one-time VA funding fee that can be financed into the loan amount."[15]

37.     A 2011 Report from the California Reinvestment Coalition found that between 2008 and 2009, in Los Angeles, the number of conventional refinance loans

---

[13] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates.  When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

[14] California Reinvestment Coalition, et al., *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

[15] https://www.wellsfargo.com/mortgage/loan-programs/fha-va-loans.

- 14-

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

made in predominantly white neighborhoods more than doubled (increasing by about 200%), while conventional refinance loans declined in Los Angeles's minority neighborhoods where such refinancing was most desperately needed.[16]

38.    At the same time that conventional credit has contracted, FHA lending has expanded dramatically.  During the subprime boom, FHA lending fell as subprime lenders targeted minority communities.  Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up.  Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[17]

39.    For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%.  But for whites, the share increased to only 49%.  At present, most minority borrowers cannot gain access to the conventional mortgage market and, instead, are relegated to more expensive FHA loans.[18]

40.    A 2012 Report from the California Reinvestment Coalition "shows that black and Latino borrowers and borrowers in communities of color received government-backed loans – insured by the Federal Housing Administration (FHA) or guaranteed by the Department of Veterans Affairs (VA) – significantly more often than did white borrowers.  The findings indicate persistent mortgage redlining, and raise serious concerns about illegal and discriminatory loan steering…. [T]he report shows a pattern of two-tiered lending, in which borrowers and communities of color received disproportionately fewer conventional mortgages and disproportionately more government-backed loans than did white borrowers and communities…. [T]he

---

[16] California Reinvestment Coalition et. al., *Paying More for the American Dream V: The Persistence and Evolution of the Dual Market* (2011) (*available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-crc-et-al.pdf).

[17] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households,* at 44 (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf).

[18] *Id.* at 45.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12  733870 V2

disproportionate prevalence of FHA loans in communities of color raises fair lending flags." In particular, the 2012 Report observes that: "In Los Angeles, homebuyers in neighborhoods of color received government-backed loans five times more often than did those in predominantly white neighborhoods…. [H]omeowners in communities of color received FHA or VA refinance loans 6.5 times more often than did homeowners in predominantly white neighborhoods."[19]

**B.**   **Citi Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees**

41.    Confidential Witnesses ("CWs") are former Citi employees responsible for making, processing, and/or underwriting loans on behalf of Citi in the greater Los Angeles region. CWs describe how Citi has targeted minorities and residents of minority neighborhoods in and around Los Angeles for predatory lending practices.

42.    CW1 worked as an Area Sales Manager for CitiMortgage from 2004 to 2005 in the Los Angeles area. He managed several loan officers who originated loans for minority borrowers from a wide region, including the City of Los Angeles.

43.    CW2 was a mortgage call center manager during the 2009-2011 timeframe, employed by an outsourcing company that was retained by CitiMortgage to run its call center in Southern California. He dealt with existing CitiMortgage borrowers who were seeking a refinance of their loan. He worked on about 10 refinance applications a day, speaking with borrowers and collecting documentation.

44.    The callers who spoke with CW2 were prescreened by a CitiMortgage call center in St. Louis. The pre-screeners would calculate the loan-to-value ratio of the borrower's property. If it was 80 percent or more, the borrower was sent to CitiMortgage's Loss Retention Department in Ann Arbor. If the borrower had

---

[19] California Reinvestment Coalition, *Paying More for the American Dream VI: Racial Disparities in FHA/VA Lending* (2012) (*available at* http://calreinvest.org/system/resources/W1siZiIsIjIwMTIvMDcvMTgvMTZfMzVfM jNfMV9wYXlpbmdtdb3JlVklfbXVsdGlzdGF0ZV9qdWx5MjAxMl9GSU5BTC5wZ GYiXV0/payingmoreVI_multistate_july2012-%20FINAL.pdf).

- 16-

missed any payments during the previous 12 months by more than 30 days, the borrower was referred to the Loss Mitigation Department.  The Loss Mitigation Department addressed loan modifications and government-assisted programs like the Home Affordable Modification Program ("HAMP"), as well as foreclosure or short sale proceedings.  No borrowers who were underwater in their home or had missed a payment, were eligible for a refinance.  If the loan-to-value ratio was 80 percent or less, and the borrower had paid the note on time during the last 12 months, then the borrower was pre-screened to apply for a refinance.  At that point, the borrowers were referred to CitiMortgage's Retention Department.

45.    From 2003 to 2008, CW3 worked at CitiMortgage as a senior underwriter, then as an underwriting manager and credit risk administrator, and finally as an Account Executive in Southern California.  She underwrote or oversaw the underwriting of loans from the Southern California region, including the City of Los Angeles.

46.    CW3 described CitiMortgage's internal underwriting guidelines at the time as being mostly in line with Fannie Mae guidelines, except that CitiMortgage had a few "overlays" of their own guidelines.  Underwriters had modest leeway to "write outside of the box" for good loan candidates that did not meet the guidelines; the Bank's Credit Risk Administrators could override the guidelines for more significant loan application variances.  Credit Risk Administrators, she said, operated under their own set of guidelines provided by CitiMortgage's Credit Policy Department.

47.    During the 2010-2011 timeframe, CW4 worked as an assistant account manager and client advisor for an outsourcing company that serviced Citibank mortgages.  She worked with Citibank borrowers who were behind on their payments and were hoping to refinance or modify their existing loans.  Many of the borrowers were minorities, including minorities from the City of Los Angeles.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12  733870 V2

48.     Similarly, during the 2010-2011 timeframe, CW5 worked as a client advisor for an outsourcing company that serviced Citibank mortgages, working with Citibank borrowers who were behind on their payments and were hoping to refinance or secure loan modifications.  Many of the borrowers were minorities, including minorities from the City of Los Angeles.  Her job was to prescreen callers and determine which Citi loan program the borrower qualified for:  the HAMP program, the HARP program, Citi's in-house modification program, refinancing the existing loan, holding a short sale, or a "deed in lieu" to avoid a foreclosure.

49.     CW6 was a loan account executive for CitiFinancial, working out of multiple branches in southern California from 2008 to 2009.  His job was to sell mortgages and personal loans mostly to lower income customers, including minority borrowers in the City of Los Angeles.  The goal was to encourage borrowers to consolidate their growing personal loan debt.  During his employment, CitiFinancial – a division of Citi – principally sold mortgages with very high interest rates, *e.g.*, between 7 and 12 percent higher than the going rate.

50.     These CWs confirm that Citi targeted minorities and minority neighborhoods in Los Angeles and elsewhere for deceptive, abusive, and predatory loans, and that Citi's loan officers and brokers engaged in a myriad of deceptive, abusive, and predatory practices.

**1.     Citi targets minorities for predatory loan terms.**

51.     CW6 confirmed that the CitiFinancial sales team was financially incentivized to sell mortgages.  They received a substantial bonus for every mortgage they closed, and the bonus amount CW6 received for each loan increased, depending on how many loans he sold in a month.  CW6 said he was often uncomfortable about pushing customers into expensive loans that perhaps were not in the borrowers' best interests.  He tried to talk to his manager about it, but the manager told him, "We're not making them sign."

- 18-

52.   CW6 said customers were often desperate and struggling financially, lacked education, and often spoke little English.  Most did not understand the repercussions of the mortgages they signed.  The one thing they understood and were most focused on was the monthly payment.  "We were told to sell it on the monthly payment," he said.  "Not the (interest) rate."  By consolidating credit card or personal loan debts into a 30-year mortgage, the Bank stretched the payments out over a much longer time period, and therefore the refinancing lowered the amount required to pay every month.

53.   When CW6 told distressed, low-income borrowers that their monthly debt payments would decrease by a few hundred dollars every month if they took out a mortgage, it was an enticing offer.  It was often all they cared about.  He was instructed to downplay the interest rate, which was extremely high, by emphasizing the lower monthly payment.  "They (management) teach you to be very persuasive and not take no for an answer."  CW6 said salespeople were required to inform the borrower of the monthly payment, the interest rate and length of the loan, but nothing else.  Salespeople were discouraged from explaining the loan and its more complicated repercussions in detail to the borrower.  They did not instruct the borrower on the repercussions of the loan, or explain how the borrower would now be paying interest on a $5,000 personal loan for 30 years.

54.   According to CW6, about 80 percent of the customers targeted for bigger and more expensive personal loans were minorities.  An even higher percentage the Bank targeted for mortgages were minorities.  If the borrower had personal debts and an existing mortgage, salespeople were taught to push a second or even a third mortgage to consolidate the personal debt.  If the borrower had equity in their home, the salespeople were taught to push a loan that would pull the equity out of the house as a cash payout or to pay down personal debts.  "You try to convince them to use the equity in their home," he said.  Salespeople suggested the borrowers

1   use the equity to go on vacation, pay off debts, or save for a rainy day.  These

2   borrowers were predominantly minorities.

3       55.     As part of his job, CW6 was provided with customer lead lists.  The

4   leads were predominantly minorities.  Other potential customers called into

5   CitiFinancial inquiring about marketing materials that were mailed to lower income,

6   minority neighborhoods.

7       56.     When CW6 worked in his base branch, which was located in a wealthy,

8   predominantly white neighborhood, he did not have any white, middle-class

9   customers.  Instead, the majority of his customers were lower-income minorities who

10  had been targeted by CitiFinancial marketing in their neighborhoods or they were on

11  lead lists that were heavily weighted with minorities.  When he worked in Los

12  Angeles branches, he said the number of minority customers was even higher, and

13  that the sales teams there were even more aggressive about selling mortgages.

14      **2.   Citi gives its employees discretion to steer people who qualify for
        prime mortgages into discriminatory mortgages (and pays its
15      employees more for doing so).**

16      57.     CW1's loan officers sold both subprime and prime loans.  Inevitably,

17  some loan officers pushed subprime loans because they received higher

18  compensation (*e.g.*, in the form of bonuses to sell them).  He said he saw borrowers

19  in subprime loans who would have qualified for a better, prime-level loan.  "I

20  definitely saw people with good credit scores in subprime," he said.

21      **3.   Citi limits the ability of minority customers to refinance out of the
        same predatory loans that they previously received from the Bank.**
22

23      58.     The confidential witness statements show that Citi failed to offer

24  refinancing or loan modifications to minority customers on fair terms – which

25  constitutes a particularly egregious form of redlining, given the fact that minority

26  borrowers sought refinancing or loan modifications with respect to bad loans that the

27  Bank previously made to them.

28

- 20-

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

59.     According to CW2, many otherwise qualified refinance applicants were unable to prove their financial situation with the documents now required by CitiMortgage.  He said many of these types of borrowers were now "stuck" in the terms of their existing "no doc" loans.  They were frustrated and angry that they could not refinance because, when they signed the loans, they were told that they could refinance later.  "They had nowhere to turn."  CW2 said a large percentage – he estimated 40% – of the people stuck in this situation were minorities (with a notably high rate of Hispanics).  They lived all over the country (including the Los Angeles area).

60.     CW2 explained that many of these borrowers were in loans that were about to adjust upwards dramatically, causing their monthly payments to potentially double.  And many of these borrowers were in interest-only loans that were about to start requiring payments on the principal amount, as well as higher interest rate payments.  These borrowers, he said, could not understand why CitiMortgage now refused to work with them on a refinance of their loans.

61.     Similarly, CW4 said some of the borrowers "were stated income (for the original loan) … Now everything's changed."  Many of the "stated income" borrowers, including members of minority groups from the Los Angeles area, got angry or expressed confusion or frustration when told they would now have to provide documentation of their income in order to qualify for refinance.  The qualification guidelines had changed, she said.  The borrowers felt Citibank had engaged in a bait-and-switch scheme.  CW5 provided much the same statements.

62.     CW5 observed that *non*-minorities tended to qualify more often through Citi for the HARP program.  The HARP program did not damage the borrowers' credit, and drastically lowered the interest rate for the life of the loan, effectively allowing borrowers who were underwater in their homes to refinance at lower market rates.  However, CW5 also observed that minority borrowers stuck in

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12  733870 V2

subprime loans would not qualify for HARP, because they were often struggling to keep up with payments, as their adjustable interest rates shifted upwards and/or the interest-only periods ran out.  As a result, she said minority borrowers in subprime loans tended to be screened and told to apply for HAMP program loan modifications.

63.   "They would kick back a lot of the minorities and old people" as unqualified, CW4 said.  "I couldn't talk on the phone with them anymore.  I'd just say, 'Oh my God, I wish I could help you.'  They were in financial hardship.  It was just awful.  Awful."

64.   According to CW5, many of the minorities who had been enticed into expensive adjustable loans were not capable of paying for the loan once the payments adjusted upwards.

65.   CW5 said many minorities attempting to obtain a modification of their subprime loans struggled with Citi's application process that sometimes took several months.  Citi would repeatedly request more documents over the protracted application process.  Sometimes, she noted, the borrowers would simply receive a denial of the modification from Citi, purportedly for lack of sufficient documents.  She believes that Citi did not do a good job of explaining the process to borrowers or assisting them through this process, and that Citi's lack of assistance to borrowers led to many foreclosures.

66.   In CW5's view, Citi "wasn't really thinking about preserving the property or keeping the people in the property.  It was just foreclose, foreclose, foreclose."  She said it was obvious to everyone within the Bank that borrowers seeking modifications were falling through the cracks and ending up in foreclosure, perhaps unnecessarily.  "This was not one incident, this was a huge problem," she said.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12  733870 V2

**4.     Citi engages in other abusive lending practices.**

67.     The CW statements further demonstrate that Citi loan officers and brokers had substantial discretion to increase the costliness of loans, and that they regularly used this discretion at the expense of minority borrowers.

68.     During his tenure at CitiMortgage, CW1 was under intense pressure to generate and close loans.  During conference calls every day, for instance, senior managers pushed him and other junior managers to hit their loan quotas (based on loan volume) for their branches.  The area managers were often told that they would be written up and eventually terminated if they failed to meet the loan quotas.  When his loan officers did not meet their quotas two months in a row, he was required to write them up.  If loan officers failed to meet their quota the next month, they were put on final notice and fired the next month.

69.     CW1's loan officers sold both subprime and prime loans.  Inevitably, some loan officers pushed subprime loans because they received higher compensation (*e.g.*, in the form of bonuses to sell them).

70.     CW3 stated that CitiMortgage required its underwriting division to put loan denials from minorities through an extra level of review to affirm the reasons for denial.  CitiMortgage's loan applications recorded the race and ethnicity of borrowers, and could be used to pick them out of all of the applications for this heightened review.  When an underwriter recommended denial of a loan application, the underwriter's manager also had to sign off on the denial, verifying it adhered to CitiMortgage guidelines.  If the loan application was from a minority, however, the file was sent to the Credit Risk Administrator for review.  When she was a Credit Risk Administrator at Citi and received a minority denial file to review, she then sent the file to two other Credit Risk Administrators – one in St. Louis and one in Texas – to review.  The three of them would then discuss the file to determine if the denial adhered to loan guidelines.

- 23-

71.    CitiFinancial management also trained salespeople to push the company's high interest rate mortgages on people who were already struggling to pay their existing debt, CW6 said.  Often these customers had incurred the debt because CitiFinancial had previously pushed personal loans with high interest rates onto the customer.  When the customer would reach his or her debt limit on one loan, CitiFinancial taught its salespeople to push refinancing options on the customer that would extend the length of the loan, lowering the monthly payment, but increasing the interest rate.  The refinancing also included high fees that were rolled back into the loan and tacked onto the principal.

72.    CW6 explained that once customers were over their heads in debt on personal loans, the CitiFinancial salespeople targeted them for a high-rate mortgage as a way to consolidate their debt:  "Once you exhausted all of their options for an unsecured personal loan, once they've already reached the max they can borrow, all they have left is to (take out a mortgage)," he said.  "It was the only way we could extend their payments."  He said steering customers already in CitiFinancial personal loans into high-rate mortgages was a top goal of his job, promoted by his managers.  CW6 also observed that some of the mortgages sold by the Bank had balloon payments.

C.    **Minorities in Fact Receive Predatory Loan Terms from Citi**

73.    As discussed herein, Citi's *predatory* loans include:  high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

74.    Data reported by the Bank and available through public databases shows that in 2004-2011, 41.3% of loans made by Citi to African-American and Latino

- 24-

customers in Los Angeles were high cost, but only 14.5% of loans made to white customers in Los Angeles were high cost.  This data demonstrates a pattern of statistically significant[20] differences in the product placement for high-cost loans between minority and white borrowers.[21]

75.    The following map of Citi predatory loans originated in Los Angeles between 2004-2011 illustrates the geographic distribution of predatory loans in African-American and Latino neighborhoods and white neighborhoods in Los Angeles.  This map demonstrates that Citi's predatory loans are disproportionately located in minority neighborhoods.



---

[20] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%.

[21] As alleged throughout the complaint, all references to the date range 2004-2011 are intended to include the time period up to and including December 31, 2011.

- 25-

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

### D. Minorities in Los Angeles Receive Such Predatory Loan Terms from Citi Regardless of Creditworthiness

76. According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

77. Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV. 941, 947, 949 (2011), one study concluded that "[e]ven after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low-risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.[22]

78. Similarly, the Center for Responsible Lending's November 2011 Report, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, at 21-22, stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges." For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows: whites – 6.2%; African-American – 21.4%; and Latino – 19.3%.

79. Moreover, data reported by the Bank, and available through both public and private databases, shows that minorities in Los Angeles received predatory loan terms from Citi more frequently than white borrowers, regardless of creditworthiness.

---

[22] Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (internal citation omitted) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf)

- 26-

80.     A regression analysis of this data, controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2011, an African-American borrower was 2.273 times more likely to receive a predatory loan than was a white borrower possessing similar underwriting and borrower characteristics.  The regression analysis further demonstrates that the odds that a Latino borrower would receive a predatory loan were 2.389 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a predatory loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

81.     The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 3.050 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 2.614 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

82.     A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Los Angeles were more likely to receive predatory loans than were borrowers in heavily white neighborhoods.  For example, a borrower in a heavily minority census tract (census tract consisting of at least 80% African-American or Latino households) was 4.052 times more likely to receive a predatory loan as was a borrower with similar characteristics in a heavily

white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

83.     This data also establishes that Citi disproportionately issued government loans with higher risk features (FHA/VA) to African-American and Latino borrowers in Los Angeles from 2009-2012.  A regression analysis, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that an African-American borrower was 3.423 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  The regression analysis further demonstrates that a Latino borrower was 3.423 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

84.     Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

## VI.     STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE

85.     As alleged herein, Defendant Citi has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2002 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of minority borrowers, Citi adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice conduct is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to UCL has not commenced to run.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

# VII.   CLAIM FOR RELIEF

## CLAIM FOR RELIEF

**(Violation of the Unlawful Prong of the Unfair Competition Law based on violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)**

86.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

87.    Defendants have engaged in, and continue to engage in, acts or practices that constitute unfair competition in violation of the unlawful prong of section 17200 of the California Business and Professions Code, premised on violation of the federal Fair Housing Act.

88.    The Fair Housing Act's stated purpose is to provide, "within constitutional limitation, for fair housing throughout the United States."

89.    In contravention of that purpose, Citi's acts, policies, and practices as described herein constitute intentional lending discrimination on the basis of race. Citi has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Los Angeles for different treatment than residents of predominantly white neighborhoods in Los Angeles with respect to mortgage lending.  Citi has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Citi has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms, including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  Citi has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

90.    Citi's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles as

- 29-

compared to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles.  This adverse and disproportionate impact is the direct result of Citi's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when Citi had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps.  These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles to receive mortgage loans from Citi that have materially less favorable terms than mortgage loans given by Citi to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles.

91.    Citi's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act, and therefore the unlawful prong of the UCL, as:

(a)    Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)    Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

92.     Citi's policies or practices are not justified by business necessity or legitimate business interests.

93.     Citi's policies and practices are continuing.

94.     Citi's policies and practices, as described herein, have had the purpose and effect of discriminating on the basis of race or national origin.  These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

95.     Plaintiff has a substantial interest in protecting the well-being of its populace – and particularly in securing its residents from discrimination and ensuring "fair housing throughout the United States."

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the People demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the People respectfully pray that the Court grant it the following relief:

A.      Pursuant to Business and Professions Code section 17203, that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged in the First Cause of Action.

B.      Pursuant to Business and Professions Code sections 17206, that Defendants, and each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred dollars ($2,500.00) for each violation of Business and Professions Code section 17200, in an amount according to proof.

C.      That Plaintiff recovers its costs of suit.

D.      For reasonable attorneys' fees; and

- 31-

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12  733870 V2

1        E.      For such other equitable relief as is just and proper.

2

3    DATED:  December 19, 2014

4                                         By: /s/ Michael N. Feuer

5    Michael N. Feuer (SBN 111529)
     City Attorney

6    James P. Clark (SBN 64780)
     Chief Deputy City Attorney

7    CITY OF LOS ANGELES
     200 N. Main Street, Room 800

8    Los Angeles, CA 90012
     Phone: (213) 978-8100

9    Mike.feuer@lacity.org
     James.p.clark@lacity.org

10

11   Steve W. Berman
     HAGENS BERMAN SOBOL SHAPIRO LLP
     1918 Eighth Avenue, Suite 3300

12   Seattle, WA  98101
     Telephone:  (206) 623-7292

13   steve@hbsslaw.com

14   Elaine T. Byszewski (SBN 222304)
     Lee M. Gordon (SBN 174168)

15   Christopher R. Pitoun (SBN 290235)
     HAGENS BERMAN SOBOL SHAPIRO LLP

16   301 North Lake Avenue, Suite 203
     Pasadena, CA  91101

17   Telephone:  (213) 330-7150
     elaine@hbsslaw.com

18   lee@hbsslaw.com

19   Joel Liberson (SBN 164857)
     Howard Liberson (SBN 183269)

20   TRIAL & APPELLATE RESOURCES, P.C.
     400 Continental Blvd., 6th Floor

21   El Segundo, CA  90245
     Telephone:  (310) 426-2361

22   joel@taresources.com
     howard@taresources.com

23

24   Robert Peck
     CENTER FOR CONSTITUTIONAL
     LITIGATION

25   777 6th Street NW, Suite 520
     Washington, DC  20001

26   Telephone:  (202) 944-2803
     Robert.peck@cclfirm.com

27

28

- 32-

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-12 733870 V2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clifton Albright (SBN 100020)
ALBRIGHT YEE & SCHMIT
888 West 6th Street, Suite 1400
Los Angeles, CA  90017
Telephone: (213) 833-1700
clifton.albright@ayslaw.com

*Attorneys for Plaintiff the People of the State of California*

- 33-